[EDITOR'S NOTE: This case is unpublished as indicated by the issuing court.] MEMORANDUM OF DECISION
This is an action for dissolution of marriage in which the principal issue concerns custody of the minor child, Ariana Michele Patterson, born January 28, 2000. The parties were married in Hawaii on September 9, 1999. Their marriage has broken down irretrievably.
The trial began in August and concluded after nine days of testimony on November 13, 2001. The court heard evidence from both parties, from several of their friends and family members, and from three psychologists including Dr. Donald Heibel, the court appointed custody evaluator, the plaintiff's current treating psychologist, and a clinical psychologist who appeared as the plaintiff's expert witness. In addition, the court examined numerous documents admitted into evidence including hospital records, the records of a psychologist who saw the plaintiff, and communications between the parties. The court observed the demeanor of the parties and witnesses and evaluated their credibility. The guardian ad litem appointed by the court was present throughout the trial and testified after all other evidence had been concluded.
The relationship of the parties has been tortured and conflicted at least since it changed from a friendship to what would ordinarily be described as a romantic relationship. An important question for the court in determining what custodial arrangements will serve the best interests of the child is the degree to which the parties have repaired or will be able to repair their fractured communications process.
Two events occurred in the end of 1997 which have implications for the court's determination of the best interests of the child now. First, the plaintiff developed a belief that the defendant was suicidal. He formulated this belief late the previous year, and during the summer and fall of 1997 observed behavior by her that in his mind indicated the defendant was depressed, but he did not believe that she was actually going to commit suicide until after a telephone conversation with her in about October of 1997. On December 11, he sent her a long e-mail in which he referenced what he said was her goal not to outlive her cats, assured her that he respected her goals, presumably including that one, and told her how much she reminded him of his sister, whom he still loved. His sister had committed suicide many years earlier. The plaintiff believes that this email was instrumental in blocking the defendant's impending suicide because he had successfully utilized the Rogerian technique of "a hook and a hug" that he had learned in college as a crisis counsellor. The court does not credit that belief. This communication is either a promise to forgive the suicide he expected or a grant of permission by the plaintiff upon the defendant for her to kill herself.[1] There is, however, no even remotely credible evidence that the defendant was ever suicidal, or ever suffered from any significant psychiatric condition except post-partum depression. CT Page 16213
The second event to occur during the fall of 1997 was related. According to his testimony, the plaintiff became anxious over the defendant's potential suicide and consulted with his general practitioner seeking relief for his loss of appetite and impaired sleep. The doctor prescribed Prozac over the telephone and the plaintiff began taking it in mid-December. According to him, the Prozac caused him to experience an adrenal crisis which led to his admission to the Institute of Living on December 21, 1997, following an emergency visit to St. Frances Hospital just after midnight on December 21. Although his emergency room visit to St. Francis was for adrenal insufficiency, he complained to the physicians of depression and asked for a psychiatric admission. After leaving St. Francis, he returned home, self-adjusted his medication, slept, and awoke feeling ill. Institute of Living Records report that the plaintiff's former wife sought emergency admission for him because he had threatened to harm himself.[2]
The records from the Institute are replete with references to the plaintiff's depressed mood and suicidal ideation, and with references to his frequent denial of both. The medical staff did a complete psychological evaluation of the plaintiff and discharged him in early January. While the records are clear that he continued to deny being suicidal, they are also clear that he was both depressed and very distressed upon his admission.
Neither of these events is in itself significant. Both happened before the child was conceived and before the marriage took place. They do not raise direct issues concerning the cause of the breakdown of the marriage, and they do not directly implicate the plaintiffs present ability to interact appropriately with the child. Rather, their importance is in how they continue to affect the parties. The plaintiff devotes considerable effort to demonstrate that the entire Institute of Living admission was the result of a misdiagnosis on the part of the staff. While there is room for some question about the etiology and severity of his symptoms, there is no doubt that the plaintiff was experiencing considerable emotional stress when he was admitted. His refusal to recognize that fact and insistence that any observation by the medical staff to the contrary is wrong evidences an inability on his part to perceive or recall certain things either completely or objectively.
More importantly, the plaintiff has continued at least until the recent past to attribute mental illness to the defendant, and he has said that to pretty much anyone who would listen. He testified that his treatment by Dr. Sarah Gamble, a clinical psychologist he began seeing shortly after his release from the Institute, began with a brief discussion of Marianne's suicide and then progressed to his concerns about Marianne CT Page 16214 wanting (against his will) to reinitiate a relationship with him. Dr. Gamble's notes indicate, however, that his early treatment concerned his re-emergent grief over his sister's suicide and difficulties stemming from his involuntary hospitalization.[3] In fact, his sessions with Dr. Gamble were focused on Marianne for many months, and he was at one point obsessive in detail. In a chilling note in May, 1998, Dr. Gamble wrote, "I feel more interested as we both start detective-style fantasizing re: M's possible traumatic past. Good plot for a novel." Dr. Gamble's records underscore the plaintiff's inability accurately to perceive or present past events and his long-lasting effort to attribute mental instability and abusive behavior to Marianne.[4] In 2000, he repeated the same concerns about Marianne to Dr. Heibel in a ten page, single spaced letter which referenced, among other things, her "mysterious psychological history."
After the parties separated, the defendant became controlling, guarded, and rude toward the plaintiff, particularly with respect to issues concerning the child. These behaviors exacerbated after she learned that the plaintiff was seeking shared custody. Dr. Heibel, in particular, was critical of her for those reasons. Her conduct must be viewed in context, however. The plaintiff pursued her relentlessly over several years, and he declared her to be suicidal. He used a style of persuasion which overwhelmed with detail, argument, and reargument. The level of his obsession with her and the relationship is illustrated by the fact that he saved hundreds of e-mail letters and prepared a Memoirs of the relationship. Moreover, with no reliable evidence, he determined that she was mentally ill, and over time successively told the Institute's staff, his psychologist, Dr. Heibel, his minister, their condominium administrator, and others of that belief. He also concluded that the defendant was a danger to him, a point he shared with others, and that she would harm the child so that she could blame it on him. He now perceives, correctly, that these beliefs were wrong, but at one point he expressed such concerns to the child's pediatrician. The plaintiff sees himself as the victim of parental alienation by the defendant, and while he acknowledges that it has not been successful, he feels that it has been attempted. The court does not find that to be true. The court finds that the defendant does not want to be involved in the plaintiff's life, but that she does want the child to be. The court finds that the defendant's guarded, controlling, and rude behavior were necessary defenses appropriately or at least understandably adopted in light of her knowledge of the plaintiff's manner toward her and statements about her.[5] However, while they were appropriate at an earlier stage in the parties' relationship and the child's life, they are no longer acceptable and will not be for so long as the plaintiff ceases his efforts to control the defendant and stops slandering her regarding her mental health and parental fitness. CT Page 16215
The plaintiff's style and the defendant's response to it continue to infect their ability to communicate with each other regarding their child, although not to the extent they once did. They have disagreed over the child's home, religion, and godparents. Each separately had her initiated in a different faith, although the defendant invited the plaintiff to the child's Catholic Christening while the plaintiff only told the defendant at the last minute of his intention to have the child initiated into his Unitarian congregation on Mother's Day, 2000. They have disagreed over her day care arrangements and who could be present during visitations. They have, in fact, disagreed over her very name, the plaintiff having chosen to call her Shelley for more than a year after her birth. They continue to disagree about an access schedule and the issues of sole versus joint custody and shared versus primary parenting.[6]
These latter disagreements are part of the litigation process, but the earlier disagreements were totally inappropriate. There is reason to believe that the parties have made progress m their ability to communicate, but during a meeting between them while trial was pending the plaintiff made some unacceptable threats, not to her safety but to her parenting opportunities.
Both of the parties are intelligent, engaging, and interesting people who are enjoying very successful professional careers and are involved in their extended families and to a lesser extent in their community. The defendant has a very close relationship with her parents, who provide supervision of the child while the defendant works. The plaintiffs relationship with his parents is presently good, although his mother's health impairs her ability to get out. His attitude toward his father in the past has varied. On the one hand, he told both the Institute and Dr. Gamble of his father's anger while the plaintiff was a child; on the other, he now denies telling them that and denies that his father was ever either physical or extremely angry toward him.
Both parties also enjoy a very fine relationship with their child. Ariana is twenty-two months old and is bright, engaged, happy, and productive with both her parents and evidently everyone else in her world. The plaintiff plays with her appropriately and has taken great efforts to make himself a more effective parent toward her.
The plaintiff does not suffer from any personality disorders, but does have personality traits which affect his interaction with the defendant.[7] He has personality traits which include obsessiveness, and his mind works in a paranoid manner. He appears to use projection as a defense.
Dr. Heibel made several recommendations, including joint legal CT Page 16216 custody, with primary residential custody and ultimate decision making to the defendant and an increasing schedule of parental access for the plaintiff. He is not wedded to the concept of primary residence, but wants the label to provide clarity of where the child will attend school.
The guardian ad litem also made several recommendations. The principal difference between her recommendations and those made by Dr. Heibel concerns parental decision making for the child. She has recommended that the plaintiff be responsible for medical decisions for the child and that the defendant be responsible for education, daycare, playgroup, and religious issues. The guardian's knowledge of the history of the case, her familiarity with and understanding of the parties and child, and her clear mastery of the documentary and other evidence make her testimony and recommendations compelling. Nevertheless, the court will not order that the plaintiff have primary decision making for the child's medical care. He testified that he wanted to be involved in pediatric visits because of his medical background. There is no evidence that he has a medical background. Because he is a thorough and determined researcher of virtually everything, he undoubtedly has considerable information about medical issues. However, he attributed medical conditions to the defendant without factual basis, and it is an unacceptable risk that he could do the same toward the child. Nevertheless, it is in the child's interest that both parents be involved in her life, that both participate in decision making concerning her, and that both amend those areas of their behavior that cause difficulty in communication. The child does not now experience the lack of respect between the parents,[8] but it is only a matter of time before she will if their behavior persists. It is also in the best interests of the child that she spend increasing amounts of time with the plaintiff but primarily reside with the defendant.
The court has taken into consideration the relevant case law and statutes, including the criteria set forth in Sections 46b-62, 46b-81,46b-83, and 46b-84 of the Connecticut General Statutes. The court makes the following orders.
1. The marriage of the parties is dissolved.
2. Neither party shall pay alimony to the other.
3. The parties will have joint legal custody of the child. The child will reside primarily with her mother. If a medical emergency occurs when the child is in the care of either parent, that parent will initiate emergency medical treatment and will immediately inform the other parent of the emergency and the treatment being undertaken. The defendant will consult with the plaintiff on non-emergency medical issues, educational issues, and other child-rearing matters and will seek his input regarding CT Page 16217 them. If the parties are unable to agree, the defendant will have final decision making responsibilities. The plaintiff will have the right to all educational and medical records of the child and to her non-privileged psychiatric and psychological records.
4. Both parties shall, within thirty days, provide the child's pediatrician with their own medical history and records, but the pediatrician shall not release those records to the other parent unless (and only to the extent that) such release is necessary for the treatment of the child.
5. The defendant shall be entitled to the tax deduction for the child in 2001. The parties shall thereafter alternate that deduction each year. The parties shall exchange whatever documents are necessary to effectuate this order.
6. The plaintiff shall have access to the child and parenting responsibilities as follows:
a. Tuesdays and Thursdays from 5:00 p.m. until 7:00 p.m. commencing immediately. When the child has reached the age of four, one of these days during any week in which there is no overnight visitation on the succeeding weekend shall be an overnight, with the child returned to her child care provider or to school the following morning;
b. Saturday, December 15, 2001, Sunday December 23, 2001, and on Saturdays or Sundays in accordance with that alternation thereafter from 9:30 a.m. until 7:00 p.m. until January 26, 2002. Thereafter, commencing on February 2, 2002, the plaintiff shall have the child on alternating Saturdays from 9:30 a.m. until Sunday at 11:00 a.m. and, on those weeks he does not have overnight visitation, on Sundays from 9:30 a.m. until 5:00 p.m.
d. Commencing on June 28, 2002, the plaintiff shall have alternating weekends with the child from 5:00 p.m. on Fridays until 5:00 p.m. on Sundays. If, after the child reaches the age of four, the weekend is followed by a Monday holiday, then alternate weekend visitation will include the Monday holiday.
e. The child will be with the parent on the following holiday schedule:
 Easter 2002, with plaintiff, and alternating annually thereafter,
 July 4, 2002, with defendant, and alternating annually thereafter except that if July 4 falls on a CT Page 16218 Monday the schedule in 4(d) will apply;
 Thanksgiving 2002, with plaintiff from 9:30 a.m. until 7:00 p.m., and alternating annually thereafter;
 Christmas Eve, from 9:30 a.m. until 4:30 p.m. with the plaintiff annually until Christmas Eve 2010, then alternating annually;
 Christmas, from 4:30 p.m. December 24 through December 26th with the defendant annually until Christmas Day 2010, then alternating annually;
f. The child will share vacations with her parents during which other visitation will not occur, as follows:
 Annually, with the defendant, two consecutive weeks during the summer months until 2010, then three consecutive weeks;
 Annually, with the plaintiff, two non-consecutive weeks during summer months until 2007, and then two consecutive weeks during the summer until 2010, then three consecutive weeks.
 If either party has vacation time during a period when the other is working, that party can notify the other of that fact and have the child during the day for that vacation, subject to school, but the vacationing party is not required to do so.
g. The party receiving the child will always pick the child up at the other party's residence.
Nothing in these orders precludes the parties from agreeing to greater parenting responsibility and access for the plaintiff.
7. The parties are ordered to participate in the PEACE program to improve their communication and interactional skills. The psychologists at the PEACE program will advise the Guardian Ad Litem of the parties' progress, and the Guardian or either party may seek further relief.
8. The plaintiff is ordered to continue in psychotherapy with his present treating psychologist for so long as is determined by his treating physician/psychologist to be necessary. CT Page 16219
9. Both parties shall keep all aspects of these proceedings secret, hidden, and confidential from the child and shall require their agents, executives, and other persons to do so. They shall not discuss with her the pre-trial or trial proceedings, any exhibits or testimony, or any other aspect of the case, and they shall not keep any documentary materials including notes, transcripts, or exhibits in any place where the child might find them, including in an unlocked location in their homes and on any computer which is accessible to the child. The plaintiff shall not show or permit the child to see his memoirs, e-mail collection concerning the parties, or any other material he has collected concerning the parties' relationships with each other or with the child. The court is conscious in making these orders that the plaintiff has indicated that his purpose for proceeding with this litigation was in part to establish a record for the child. The child can have no benefit from being exposed to such a record, and it is not in her best interests that she be so exposed. This file and all exhibits will be sealed.
10. Each party shall exert every reasonable effort to foster access and feelings of love between the child and the other parent as well as the other parent's extended families. Neither party will say, write, or otherwise disclose any opinion to the child that denigrates the other parent or causes the child to loose respect or affection for the other parent, and will not permit the child to be in the presence of anyone who does so.
11. Each party will keep the other reasonably informed of the whereabouts of the child while she is in their care, and will allow the child daily phone access when the child is old enough to have a meaningful conversation.
12. Neither party shall pay alimony to the other.
13. The plaintiff shall pay child support in the amount of $177.00 per week until the child reaches the age of eighteen or graduates from high school, whichever is later. In addition, the plaintiff shall pay for 48% of any day care expenses actually paid to a person providing day care for the child.
14. The defendant shall maintain the child on medical insurance. The plaintiff shall provide secondary medical coverage as it is available through his employment at a reasonable cost, and primary coverage if the defendant becomes unable to provide it. The defendant shall pay the first $100.00 of unreimbursed medical expenses annually, and thereafter the parties shall share such expenses, with the defendant paying 52% and the plaintiff paying 48%. For purposes of this order, medical expenses shall include services provided by medical or mental health providers including CT Page 16220 physicians, hospitals, or members of their staffs for medical care, hospital care, psychological or psychiatric care, dental care including orthodonture, or opthamological care as those providers are selected in accordance with this order. The provisions of 46b-64 shall apply.
15. Each party shall keep and hold all personal and real property now in his or her name or possession, including without limitation bank and brokerage accounts, real estate and interests in real estate, pensions, retirement accounts, furniture and jewelry except as otherwise provided, and automobiles. The wife shall return the engagement ring and wedding band to the husband.
16. The defendant shall maintain $300,000.00 in life insurance naming a trust for Ariana as beneficiary for as long as the child is entitled to receive support from either parent. The trust shall provide that the trustee may invade principal or interest to comply with the child's right to support under this judgment and other applicable law. The defendant shall have the right to name the trustee and to designate any other provision of the trust not inconsistent with these orders. The plaintiff shall, in accordance with his proposed orders, maintain a trust for the benefit of Ariana with a value of $300,000.00 for as long as she has the right to child support pursuant to this judgment and under the law, and shall immediately cause that trust to be funded. The provisions concerning that trust shall be in accord with those set forth in this paragraph. Each party shall have the right to receive information from the other annually that the provisions of this paragraph have been complied with, but both parties shall provide such information to the other for the first time not later than January 15, 2002.
17. The parties shall each pay one half of the attorneys fees incurred by the Guardian Ad Litem prior to August 3, 2001. The plaintiff shall pay all attorneys fees for the guardian ad litem from August 4, 2001 until the date of the judgment. Thereafter, attorneys fees for the guardian ad litem shall be apportioned by the court. Attorney Duell will continue to serve as guardian ad litem for a period of nine months, which may be extended by the court on her motion, the court's motion, or the motion of either party.
18. The plaintiff shall pay the defendant the sum of $22,500.00 toward her attorney fees within thirty days.
Judgment will enter accordingly.
BY THE COURT,
GRUENDEL, J. CT Page 16221